## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MP VISTA, INC., et al.**                                    **CIVIL ACTION**

**VERSUS**                                                            **NO. 10-0158**

**MOTIVA ENTERPRISES, LLC, et al.**                **SECTION: "G"(4)**

## <u>ORDER AND REASONS</u>

Before the Court is Plaintiffs MP Vista, Inc., Habib Petroleum Corp., and Bay Point Oil Corp.'s (collectively, "Plaintiffs") Motion for Class Certification.[1]  Having considered the motion, the response, the reply, the surreply, the supplemental briefs, the statements of the parties at oral argument, the record, and the applicable law, for the following reasons, the Court will deny the Motion for Class Certification.

## <u>I. Background</u>

Plaintiffs are gas station owners and operators who are franchisees of Defendants Motiva Enterprises, L.L.C. ("Motiva") and/or Shell Oil Company ("Shell") (collectively, "Defendants"). The gas station owners independently operate their gas stations, purchase gasoline from Motiva pursuant to sales agreements, are free to set their own prices for gasoline, and have complete control over whether and how to offer any ancillary products or services.  Motiva is a joint-venture partially owned by Shell, and Motiva operates a refinery in Norco, Louisiana that sold fuel to Shell and Texaco branded gas stations.  In 2004, Motiva distributed fuel from the Norco refinery to service stations in the Gulf Coast region.

---

[1]  Rec. Doc. 96.

In May 2004, Motiva learned that some of the fuel that it refined was contaminated with amounts of elemental sulfur and hydrogen sulfide; however, by the time Motiva learned of this contamination, the gasoline had already been distributed to certain dealers.  On May 26, 2004, Motiva ordered dealers that may have received the contaminated fuel to cease gasoline sales for a period of time.  Motiva subsequently tested each potentially affected station, cleared unaffected stations to reopen, and took necessary measures so that affected stations could be reopened. Accordingly, the length of time that each station was closed varied.[2]  Additionally, according to Defendants, the contamination primarily affected regular-grade and mid-grade gasoline and Motiva "encouraged" dealers with unaffected premium-grade gasoline to continue operating and to sell the premium-grade gasoline at the regular-grade price, with Motiva later reimbursing dealers for the price differential.[3]  Also according to Defendants, Motiva "never directed dealers to close their convenience stores or other ancillary businesses" and "[m]any dealers, including all three named Plaintiffs, kept operating their ancillary businesses throughout the incident."[4]  After the incident, Motiva took additional steps to offset the effects of the incident.[5]

Following the contamination incident and resulting closures, on February 21, 2007, Plaintiffs filed this pending suit in the United States District Court for the District of Delaware, alleging that they and other franchisees suffered damages because Defendants ordered them to cease their fuel

---

[2]  "Consequently, the pump shut-down period at the affected stations varied significantly, from a few hours at some stations to seven days at others."  Rec Doc. 101 at p. 3.

[3]  *Id.* at pp. 3-4.

[4]  *Id.* at p. 4.

[5]  *See id.*

sales as a result of the shipment of contaminated gasoline.[6]  The action was then transferred to this district, largely on the basis that similar actions "arising out of the same underlying fuel contamination incident" had previously proceeded in the Eastern District of Louisiana.[7]  The case was initially assigned to Judge Eldon E. Fallon but was then transferred to Judge Ivan L.R. Lemelle as related to an action previously considered by Judge Lemelle.[8]  Following the determination by Magistrate Judge Karen Wells Roby of a contested motion for leave to file an amended complaint,[9] Plaintiffs filed their amended complaint on October 26, 2010.[10]  Nearly a year later, on October 7, 2011, the case was transferred to this Court, Section "G" of the Eastern District of Louisiana.[11]  After consultation with Judge Lemelle, on December 8, 2011, this Court denied a motion by Defendants to transfer the case to Judge Lemelle.[12]

---

[6]  Rec. Doc. 1.

[7]  *See* Rec. Doc. 26 at p. 5.  Plaintiffs characterize the pending, above-captioned action as a re-filing of that earlier action.  *See, e.g.,* Rec. Doc. 96-1 at p. 4.  Defendants also imply the same and state that the pending, above-captioned action is "the second attempt to certify a class of service station dealers alleging business losses caused by the 2004 sulfur incident."  Rec. Doc. 101 at p. 1.

[8]  Rec. Doc. 36.  That case was *Liberty Shell, Inc. v. Shell Oil Company*, Civil Action No. 04-1770.  In *Liberty Shell*, another gas station owner and operator filed suit against Shell and Motiva, alleging business losses resulting from the fuel contamination incident also at issue in the instant case.  There, Judge Lemelle denied class certification, finding that Liberty Shell failed to satisfy the element of predominance as required by Rule 23(b)(3) of the Federal Rules of Civil Procedure.  *See* Rec. Doc. 96-1 at pp. 4, 21; *see also* Civil Action No. 04-1770, Rec. Doc. 99.  Plaintiffs state that Judge Lemelle found that "'all other [Rule 23] factors' favored certification 'except perhaps predominance'" and that his concerns meriting denial of class certification involved the computation of damages for potential class members.  *See* Rec. Doc. 96-1 at pp. 4, 21.  However, the motion was denied without prejudice.  Liberty Shell subsequently settled its individual claims with Defendants, and the case was voluntarily dismissed.

[9]  *See* Rec. Doc. 61.

[10]  Rec. Doc. 62.

[11]  Rec. Doc. 85.

[12]  Rec. Doc. 89.  Local Rule 3.1.1 provides: "To promote judicial economy, conserve judicial resources, and avoid potential forum shopping and conflicting court rulings, all [related actions] must be transferred to the section with the lowest docket number, unless the two judges involved determine that some other procedure is in the interest of justice.  *If the transferee and transferor judges cannot agree upon whether a case should be transferred, the opinion of the transferee judge prevails.*" (emphasis added).

On December 27, 2011, Plaintiffs filed the pending Motion for Class Certification.[13] Therein, Plaintiffs seek to represent a class of gas station owners and operators who purchased and received the contaminated gasoline in or about May 2004.  They allege that the closures of the stations "caused consumer confidence to diminished [sic] resulting in loss of income and prolonged economic hardships for the class members."[14]  Plaintiffs contend that "each franchisee's gas station suffered direct economic damages as a result of following the Defendant's instructions to shut down, the loss of product sales, including but not limited to, gasoline sales, convenient [sic] store and other ancillary sales" and that "[c]onsumer confidence was lost in all Shell and Texaco branded stations, causing continued economic hardship, loss of ancillary business and loss of motor fuel volumes caused by volume migration to Plaintiffs' competitors."[15]

Defendants filed their response in opposition to the pending Motion for Class Certification on January 17, 2012.[16]  Following leave of Court, on March 5, 2012, Plaintiffs filed a reply[17] and Defendants filed a surreply.[18]  Additionally, both parties filed supplemental briefings in late July 2012.[19]  On July 27, 2012, this Court heard oral argument on the motion, at which time the matter

---

[13] Rec. Doc. 96.

[14] Rec. Doc. 96-1 at p. 4.

[15] *Id.* at p. 12.

[16] Rec. Doc. 101.

[17] Rec. Doc. 116.

[18] Rec. Doc. 118.

[19] Rec. Docs. 126 (Plaintiffs'), 129 (Defendants').

was taken under advisement.[20]   Accordingly, the motion is now before the Court on the briefs and the statements of the parties at oral argument.

## II. Law and Analysis

### A.  Standard for Class Certification

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure,[21] and Plaintiffs need not first establish the merits of their case in order to gain certification.[22]  Instead, in order to be certified, a proposed class must first meet the initial requirements established by Federal Rule of Civil Procedure 23(a): (1) numerosity of parties; (2) commonality of legal and factual issues; (3) typicality of the claims and defenses of the class representatives; and (4) adequacy of the representation by the class representatives.[23]  However, satisfaction of these four requirements, alone, is not enough to merit class certification.  Additionally, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b),"[24] which sets forth the types of actions that may be maintained as a class action.  As here, when plaintiffs seek certification pursuant to Rule 23(b)(3), "the court [must] find[ ] that the questions of law or fact common to class members

---

[20]  Rec. Doc. 130.

[21]  Fed. R. Civ. P. 23.

[22]  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (citing *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971)).

[23]  Fed. R. Civ. P. 23(a); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011).

[24]  *Id.* at 2548.

*predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy."[25]

Rule 23(b)(3) contains a list of "matters pertinent" to the findings of predominance and superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.[26]

"In order to 'predominate,' common issues must constitute a significant part of the individual cases."[27]   Additionally, the Fifth Circuit has explained that courts must determine the manner in which the class action would be tried in order to determine whether common legal issues predominate over individual issues and whether manageability problems preclude class litigation from being superior to other available methods of adjudicating the controversy.[28]   "The predominance and superiority requirements are 'far more demanding' than is [R]ule 23(a)(2)'s commonality requirement,"[29] and a court must "identify[ ] the substantive issues that will control the outcome, assess[ ] which issues will predominate, and then determin[e] whether the issues are common to the class."[30]   Predominance requires that central questions be "capable of class-wide

---

[25] Fed. R. Civ. P. 23(b)(3) (emphasis added).

[26] *Id.*

[27] *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).

[28] *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740, 743-45 (5th Cir. 1996).

[29] *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997)).

[30] *Id.*

determination," utilizing class-wide rather than individualized evidence.[31]  Such an inquiry is necessary to prevent the class from "degenerating into a series of individual trials."[32]

As the parties seeking certification, the burden to show that all of the requirements for class certification have been met rests on the plaintiffs.[33]  Then, the decision of whether to certify a class lies soundly within the district court's discretion; however, the court "must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class."[34]  Further, "Rule 23 requires the Court to find, not merely assume, the facts favoring class certification."[35]

In this case, Defendants challenge Plaintiffs' Motion for Class Certification on the basis of the typicality and adequacy of representation[36] factors of Federal Rule of Civil Procedure 23(a) and the predominance and superiority factors of Federal Rule of Civil Procedure 23(b)(3).  However, because Plaintiffs must satisfy their burden as to all four of the Rule 23(a) factors, as well as to the predominance and superiority factors of Rule 23(b), if Plaintiffs fail to demonstrate that any one of these requirements has been met, then this Court must deny certification.  For the reasons explained below, this Court finds the predominance requirement has not been established.  Therefore, even if the Court were to assume that all other requirements for class certification were met, the

---

[31] *Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699, 702 (5th Cir. 2011).

[32] *O'Sullivan*, 319 F.3d at 738; *see also State of Ala. v. Blue Bird Body Co.*, 573 F.2d 309, 328 (5th Cir. 1978) ("[I]f the effect of class certification . . . will in actuality require a multitude of mini-trials . . . , then the justification for class certification is absent.").

[33] *See Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005).

[34] *Castano*, 84 F.3d at 740.

[35] *Unger*, 401 F.3d at 321 (citing Fed. R. Civ. P. 23(b)(3)).

[36] The Court notes that Defendants have asserted a colorable argument that the named plaintiffs cannot adequately represent the proposed class because of the adverse interests between the named plaintiffs and absent potential class members in a separate lawsuit proceeding in Florida. *See* Rec. Doc. 101 at pp. 22-23; Rec. Doc. 129 at pp. 2-3.

predominance factor is dispositive.  As such, the Court will limit its analysis to a discussion of predominance, and likewise, the Court will address only the arguments advanced by the parties concerning predominance.

### B.  Parties' Arguments Regarding Predominance

Here, Plaintiffs assert that predominance exists because "[c]ommon issues typically predominate over any individualized issues related to the sale and delivery of the contaminated motor fuel to Plaintiffs and putative class members because the critical elements of each claim are proven with the same evidence."[37]  Specifically, Plaintiffs state the common "central issues" as follows:

> whether the subject motor fuel was contaminated, whether the contaminated gasoline was sold and delivered to various franchisees across the effected states, whether Defendants issued instructions to cease and desist the sale of the contaminated motor fuel and the economic damages arising there from . . . .[38]

These issues notwithstanding, Plaintiffs state that "it is likely that liability will not be hotly contested."[39]  Instead, Plaintiffs state that it is likely that "the damages suffered by the class will be aggressively debated."[40]  Plaintiffs then contend that they will "prove damages arising from the incident on a class-wide basis through the use of experts and expert testimony."[41]

---

[37] Rec. Doc. 96-1 at pp. 1-2.

[38] *Id.* at p. 2.

[39] *Id.*

[40] *Id.*

[41] *Id.*

Plaintiffs then argue that Judge Lemelle's concerns regarding predominance in the *Liberty Shell* case, which Plaintiffs have characterized as an earlier version of the action currently pending before this Court,[42] have now been satisfied.[43]   Plaintiffs outline Judge Lemelle's concerns in the earlier action where he denied class certification, as based upon predominance and the difficulty of quantifying damages in a uniform fashion.[44]   Plaintiffs contend that they now have "a workable formula and methodology to determine and quantify the classes' [sic] damages in a uniform way" and that, as such, they satisfy the predominance requirement.[45]   Specifically, Plaintiffs have retained an expert witness, Dr. Richard Olsen, to develop a formulaic method for calculating damages. Specifically, in Dr. Olsen's expert report, Dr. Olsen states that:

> [D]amages can be estimated with a reasonable degree of expert certainty and grounded in facts for (1) "lost sales volume-related fuel margins" damages on volumes that would have been sold at normal margins "but for" the tainted fuel incident, (2) "lost sales volume-related non-fuel margins" damages on non-fuel sales associated with fuel volumes that would have been sold "but for" the tainted fuel incident, (3) "lost margins" damages on volumes actually sold after the incident, and (4) "market interest" on damages.[46]

Dr. Olsen contends "that reasonable and reproducible estimates of damages can be made in a formulaic, easily-repeated[ ] basis that considers the 'before' and 'after' business experiences of each plaintiff site."[47] Based upon this model and utilizing "easily verifiable business records" and/or

---

[42] *Id.* at p. 4.

[43] *Id.* at pp. 21-23.

[44] *Id.* at p. 21 ("The Court wanted to know that there was some formula that could be applied at trial to ascertain concrete damages.") (citation omitted).

[45] *Id.*

[46] Rec. Doc. 96-2 at p. 6.

[47] *Id.*

industry average information,[48] Plaintiffs contend that "a reliable, verifiable and easily reproducible system exists that can be applied to all putative class member[s]" and that, thus, they have satisfied the predominance requirement.[49]

In opposition, Defendants contend that Plaintiffs have failed to establish predominance and have "wholly failed" to correct the problems underlying the court's refusal to grant class certification in the *Liberty Shell* matter.[50]   Defendants state that Judge Lemelle's denial without prejudice left the matter open for reconsideration only "'*if* there [were] some common plan, some common proof, some way of doing this'" and it was shown to him in a "'***convincing***'" manner.[51] Defendants note that Plaintiffs have failed to provide a trial plan as required by the Fifth Circuit[52] and that the methodology of their expert "admittedly ***assumes*** the element of causation and ***ignores*** (i.e., fails to control for) other possible causes of decreased sales . . . ."[53]  Further, Defendants argue that the incident "had no class-wide, systemic effect" and that "determining what (if any) losses were caused by the incident would require a station-by-station assessment of each dealer's experience and economic circumstances."[54]       As an initial matter, Defendants argue that the Court must first evaluate "'the relevant claims, defenses, facts, and substantive law presented in the

---

[48] Rec. Doc. 96-1 at p. 22.

[49] *Id.* at pp. 22-23.

[50] Rec. Doc. 101 at p. 1.

[51] *Id.* at p. 5 (citing Ex. 1, Rec. Doc. 101-2 at p. 48-49) (emphasis added by Defendants).

[52] *Id.* at p. 8 (citing *Madison v. Chalmette Refinery, L.L.C.*, 637 F.3d 551, 556, 557 (stating that "detailed trial plans" are necessary to allow a court to "seriously consider[ ] the administration of the trial[ ]" before it grants class certification)).

[53] *Id.* at p. 1.

[54] *Id.* at p. 2.

case.'"[55]   Defendants note that Plaintiff's complaint asserts two causes of action, negligence and

"breach of 'the implied warranties of fitness for use and merchantability as provided by the Uniform

Commercial Code,'"[56] and that proximate causation is an essential element in both of these causes

of action.[57]   Defendants then note that Plaintiffs seek damages from decreases in sales volumes and

profit margins experienced by the proposed class members during and after the sulfur incident –

specifically, Defendants note that Dr. Olsen proposes to calculate damages for each dealer for an

eight-month period after the contaminated fuel incident.[58]

Regarding Dr. Olsen's proposed method of calculating damages, Defendants first discuss his

method for calculating lost profits from a diminished volume of gasoline sales.   Specifically,

Defendants note that in Dr. Olsen's report, he compares the volume of gasoline sold in May through

December of 2003, the year before the incident, to the volume sold in May through December of

2004, the damages period, to determine what Dr. Olsen refers to as a "Fuel Volume Shortfall."[59]   As

Defendants highlight, Dr. Olsen testified during his deposition that he assumes that the entire "Fuel

Volume Shortfall" was caused by the fuel contamination incident, and he does not account for any

other possible causes of lower sales.[60]   This "Fuel Volume Shortfall" is then multiplied by each

station's "historic" profit margin on gasoline to calculate the lost profits due to decreased fuel

---

[55] *Id.* at p. 8 (quoting *Allison v. CITGO Petrol. Corp.*, 151 F.3d 402, 419 (5th Cir. 1998) (citation omitted)).

[56] *Id.* at p. 9 (citing Rec. Doc. 62 at pp. 2-3).

[57] *Id.* at pp. 9-10 (citations omitted).

[58] *Id.* at p. 10.

[59] *Id.* at p. 11.

[60] *Id.* (citing Ex. 14, Rec. Doc. 101-4 at pp. 31, 33-34).

volume.[61]

Next, Defendants discuss Dr. Olsen's method for calculating lost profits due to diminished ancillary sales, which includes such things as convenience store sales and car washes. Defendants note that Dr. Olsen assumes that each dealer's ancillary sales would decrease by the same percentage as the station's fuel volumes and proposes to multiply the dealer's historical profit margin on each category of ancillary items by the calculated percentage of fuel volume shortage. Defendants contend that this method ignores the evidence in this case, which demonstrates that one of the named plaintiffs, MP Vista, had *higher* ancillary sales in the post-incident period than in the pre-incident period, and ignores the published literature, which finds that no direct connection can be inferred between fuel and non-fuel sales.[62]

Third, Defendants consider Dr. Olsen's methodology for determining damages for reduced profit margins on gasoline sold after the incident. Defendants note that, in order to calculate these damages, Dr. Olsen compares each dealer's records of its profit margins on gasoline before and after the incident.[63] Defendants then highlight the fact that under this method, none of the proposed class representatives can demonstrate any damages. Specifically, MP Vista and Bay Point Oil did not suffer a decrease in fuel margins, and "Habib Petroleum lacks sufficient documentation to determine its historical margins."[64]

Finally, Defendants point out that Dr. Olsen agrees that Defendants are entitled to a credit

---

[61] *Id.* (citing Ex. 14, Rec. Doc. 101-4 at p. 31).

[62] *Id.* at p. 12 (citing Ex. 14, Rec. Doc. 101-4 at pp. 35-36).

[63] *Id.* (citation omitted).

[64] *Id.* (citation omitted).

for the "mitigation reimbursements and rebates" that Motiva previously paid to dealers after the incident.[65]  Defendants stress that such amounts would have to be calculated for each dealer on an individual basis.[66]

Defendants contend that Plaintiffs cannot satisfy the predominance element because Plaintiffs and Dr. Olsen admit that the issue of proximate causation – that is, whether the contaminated fuel incident proximately caused any particular station to lose sales and, if so, to what extent – is highly individualized.  Defendants also cite Fifth Circuit case law for the proposition that "[c]ertification of a damages class is improper where the element of 'causation' or 'fact of damage' cannot be established for every class member through proof common to the class.'"[67]  Defendants note that Dr. Olsen testified that many factors other than the contaminated fuel incident could have caused a drop in sales at any service station,[68] and that representatives for the named plaintiffs admitted in their depositions that the following factors could have caused any particular station to lose business during the damage period: (1) the retail price charged by the station, (2) the station's location, (3) the rent paid by the dealer, (4) temporary road closures or construction near the station, (5) temporary repair work at the station, (6) the opening or closing of a nearby competitor station, (7) customer loyalty, and (8) weather events such as hurricanes.[69]  Defendants then note that Dr.

---

[65] *Id.* at p. 13 (citing Ex. 13, Rec Doc. 101-4 at p. 10).

[66] *Id.*

[67] *Id.* (citing *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)).  Further, Defendants rely upon commentary by the Advisory Committee that drafted Federal Rule of Civil Procedure 23 for the proposition that "mass tort cases arising from a single incident are usually poor candidates for class treatment."  *Id.* (citing Fed. R. Civ. P. 23(b)(3) Advisory Comm. Note).

[68] *Id.* at pp. 14-15 (citing Ex. 14, Rec. Doc. 101-4 at pp. 20-23).

[69] *Id.* at p. 14 (citing Exs. 3, 4, 6, Rec. Docs. 101-2, 101-3).

Olsen admitted in his deposition that his method makes no effort to control for these or other factors and instead assumes that all declines were caused by the contaminated fuel incident. Defendants argue that because Dr. Olsen fails to account for other potential causes of the harm, Dr. Olsen's methodology is unreliable and should be rejected.[70] To more specifically illustrate the fallacy of Dr. Olsen's assumptions and methodology, Defendants provide a persuasive example: Dr. Olsen's model assumes that *all* decreased sales during the relevant periods resulted from the effects of the contaminated fuel incident, but one of the named plaintiffs, MP Vista, was actually forced to shut down for at least seven days during the relevant period because of a hurricane.[71] As Defendants correctly note, Dr. Olsen's model does nothing to control for such other potential causes of decreased revenue.

Further, Defendants state that Dr. Olsen conceded in his deposition that in order to control for the other potential causes, the individual circumstances for every plaintiff in the class would have to be analyzed on a daily basis over the purported damage period:

> Q:   And in order to determine what other potential causes of a decline in volume there are, one would have to assess each station's individual circumstances one by one; is that true?
> A:   Day by day.
> Q:   Day by day and station by station.
> A:   Correct.[72]

Thus, Defendants conclude that "by his own admission, Dr. Olsen's methodology does ***not*** provide a reliable mechanism for determining the element of proximate causation 'on a class-wide basis

---

[70]  *Id.* at p. 15 (citing *Moore v. Ashland Chem., Inc.* 151 F.3d 269, 275, 279 (5th Cir. 1998) (en banc); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 453-54 (5th Cir. 2005)).

[71]  *Id.* at p. 16.

[72]  *Id.* at pp. 16-17 (citing Ex. 14, Rec. Doc. 101-4 at pp. 34-35).

14

using class-wide proof.'"[73]  Defendants argue that under Fifth Circuit precedent, class certification is improper in this case because an individualized inquiry into causation and damages is required.[74]

In further support of Defendants' contentions that Dr. Olsen's methodology is flawed, Defendants rely on the conclusions of their own expert, Professor John Umbeck.  According to Defendants, Professor Umbeck's analysis of the data shows that certain gas stations that could be part of the putative class actually experienced *increases* in fuel volume sales after the contamination incident and that there was "no systemic pattern" to the losses among stations where volumes did drop.[75]  Thus, Defendants contend that Dr. Olsen's assumptions are false and not to be trusted. Additionally, Defendants point to Professor Umbeck's analysis of a control group of gas stations that were unaffected by the contaminated incident, which found that gas stations in the Houston, Texas area suffered significant decreases in fuel sales in 2004 as compared to 2003, even though the area did not even potentially receive any contaminated fuel.[76]

Finally, Defendants argue that Dr. Olsen's report acknowledges that the damage calculations "are based on information or business records provided [ ] by the dealers."[77]  Defendants contend that to calculate damages under Dr. Olsen's approach, the records would have to be collected from each absent class member and subsequently analyzed.  Defendants argue that because "extensive

---

[73] *Id.* at p. 17 (citing *Benavides*, 636 F.3d at 701).

[74] *Id.* (citing *Bell Atlantic*, 339 F.3d at 302; *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006)).  Defendants further allege that this required individualized inquiry is "precisely the shortcoming that Judge Lemelle previously identified with class certification in *Liberty Shell*."  *Id.* (citation omitted).

[75] *Id.* at p. 18 (citing Ex. 18, Rec. Doc. 101 at p. 4 and Fig. 1).

[76] *Id.* (citing Ex. 18, Rec. Doc. 101 at p. 5) ("[T]here is some other factor, or factors, affecting gasoline sales at Motiva stations that have [sic] nothing to do with tainted fuel.")).

[77] *Id.* at p. 19.

file-by-file review" is necessary, Dr. Olsen's approach is not "mechanical" or "formulaic" and, therefore, that Plaintiffs have failed to establish predominance.[78]

In reply, Plaintiffs contend that class certification is proper because of "common proof as to liability and damages"[79] and, specifically, that "the common question of Motiva's liability for manufacturing and distributing sub-standard fuel overrides any individual damage calculation."[80] In support, Plaintiffs rely on the United States Supreme Court decision in *Wal-Mart Stores, Inc. v. Dukes*,[81] where the Court stated, "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."[82] Further, Plaintiffs argue that the pending case is akin to *Mullen v. Treasure Chest Casino, L.L.C.*,[83] where the Fifth Circuit upheld a district court's certification of a class of injured casino workers complaining of respiratory problems allegedly caused by inadequate ventilation. Plaintiffs contend that predominance is satisfied here because this case does not involve complicated choice of laws issues, because it involves a modest number of proposed class members, and because the contaminated fuel is central to both liability and damages questions common to the proposed class.[84]

---

[78] *Id.* at pp. 19-20 (citing *Benavides*, 636 F.3d at 701; *Bell Atlantic*, 339 F.3d at 307; *O'Sullivan*, 319 F.3d at 745).

[79] Rec. Doc. 116 at p. 1.

[80] *Id.* at p. 4.

[81] 131 S.Ct. 2541 (2011).

[82] *Id.* at 2551 (emphasis and quotation omitted).

[83] 186 F.3d 620 (5th Cir. 1999).

[84] Rec. Doc. 116 at p. 6.

Additionally, Plaintiffs do not dispute Defendants' contention that a trial plan is required under Fifth Circuit precedent.[85]  To this end, Plaintiffs propose:

> a bifurcated trial plan wherein liability would be litigated, initially, in "Phase I" premised upon the choice of laws  provision of the forum state, Louisiana.  In that only Florida and Louisiana dealer-operators are impacted, the choice of laws issue is straight forward and entails limited reference to the policy consideration underlying the products liability claims.  The "Phase II" trial will involve quantifying damages and require the mutual selection of Bellwether Plaintiffs and the expert formulaic calculations of Dr. Olsen to assess lost income, subject to Dr. Umbeck's critique.  Thereafter, the parties would be able to evaluate their positions and cogently discuss case resolution.[86]

In response to Plaintiffs' arguments and proposed trial plan, in their surreply, Defendants first respond to Plaintiffs' reliance on *Dukes*, arguing that the case undermines, rather than supports, Plaintiffs' position because "*Wal-Mart* makes clear that merely raising facially common questions is insufficient to justify certification" and that instead "what matters is 'the capacity of a classwide proceeding to generate common *answers*.'"[87] Defendants contend that the dissimilarities within the proposed class "are fatal" to class certification.[88]  Specifically, Defendants argue that the question of "whether the sulfur incident ***caused*** any particular dealer to lose business cannot be determined on a classwide basis."[89]  Defendants point to their own "unrebutted evidence" that certain gas stations did not experience decreased volumes and that other factors, such as hurricanes, caused other decreases, "thereby negating any inference that the sulfur incident was the sole cause of the

---

[85]  *Id.* (citing *Madison*, 637 F.3d at 551).

[86]  *Id.* (citing La. C.C. § 3545(2)).

[87]  Rec. Doc. 118 at pp. 1-2 (quoting *Dukes*, 131 S.Ct. at 2551).

[88]  *Id.* at p. 2.

[89]  *Id.*

17

drop at any particular station."[90]  Accordingly, Defendants allege that "each dealer's post-incident experience was unique," such that "the question of causation cannot be resolved 'in one stroke' as to all class members using classwide proof," thus making this case inappropriate for class treatment.[91]

Next, Defendants argue that Plaintiffs' trial plan fails to demonstrate "how a trial on the merits would be conducted if a class were certified."[92]  Defendants argue that Plaintiffs' trial plan is flawed for several specific reasons.  First, Defendants contend that Plaintiffs' trial plan provides no method of proving liability in Phase I because Dr. Olsen assumes causation as to each class member.[93]  Further, regarding the first phase, Defendants state that Plaintiffs' trial plan is not like that in *Mullen* because, in that case, there existed certain "'pivotal' threshold issues" that were ripe for consideration on a classwide basis.[94]  Defendants contend that Plaintiffs have identified no such issues here.[95]  Second, Defendants argue that Plaintiffs' trial plan is inadequate to the extent that it fails to "take a clear position" on the choice of laws issue.[96]  Third, Defendants respond to Plaintiffs' suggestion that certain dealers' claims be presented at trial as representative of others' claims, as

---

[90]  *Id.*

[91]  *Id.*

[92]  Rec. Doc. 118 at p. 3 (quoting *Madison*, 637 F.3d at 555)).

[93]  *Id.* at pp. 3-4.

[94]  *Id.* at p. 4 (citing *Mullen*, 186 F.3d at 625-26).

[95]  *Id.* at p. 4 and n.2 ("Unlike the *Mullen* plaintiffs, the dealers have not identified any 'pivotal' common issues whose early resolution would streamline the remainder of this litigation.  Rather, the central issue here is individual causation.").

[96]   *Id.* at p. 5 (citing *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) ("[I]nherent in the predominance inquiry is a determination of which states' substantive laws will apply to the claims.")).

Bellwether plaintiffs, in Phase II trials.[97]  Specifically, Defendants contend that Plaintiffs' suggestion that Bellwether dealers be chosen by the "mutual selection" of the parties has been rejected by the Fifth Circuit because it would not meet the requisite level of representativeness.[98]  Further, Defendants note that Plaintiffs have not proposed that results from Bellwether plaintiffs' trials be extrapolated and would instead use those results only to inform settlement discussions.[99]  As such, Defendants next argue that Plaintiffs' trial plan is incomplete because it does not explain what happens if the parties fail to reach settlement after Phase II.  Defendants suggest that at this point, individual mini-trials on damages would be necessary, thus defeating the purpose of a class action.[100] Defendants further contend that Plaintiffs cannot suggest that the Court defer consideration of post-Phase II procedures until such time as they become necessary because the Fifth Circuit has rejected such "a figure-it-out-as-we-go-along approach" to class actions.[101]  Fifth and finally, Defendants argue that Plaintiffs' trial plan raises Seventh Amendment concerns because the Phase II jury would have to revisit the Phase I jury's findings as to the fact of damages when determining the amount of damages, in contravention of Defendants' Seventh Amendment right "'to have fact issues decided by one jury.'"[102]

Responding to these arguments, in their supplemental briefing, Plaintiffs allege that the predominating issues in this case common to all members of the class include: that all class members

---

[97] *Id.*

[98] *Id.* at p. 6 (citing *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997)).

[99] *Id.*

[100] *Id.*

[101] *Id.* at p. 7 (citing *Madison*, 637 F.3d at 557).

[102] *Id.* (quoting *Castano*, 84 F.3d at 750).

received contaminated fuel, that all class members had to close their pumps, and that none of the class members were compensated for their ancillary business losses.[103]  Plaintiffs then propose a modified trial plan, which would begin with motion practice to determine liability for the contaminated fuel via a motion for partial summary judgment and a motion in limine to determine which state's laws would apply.[104]  Next, Plaintiffs propose a putative class notice, to be followed by sample trials.[105]  Plaintiffs propose that Plaintiffs and Defendants would each select three dealers whose claims would be tried in these sample trials.[106]  Under Plaintiffs' proposed trial plan, the parties would next engage in mediation.  Finally, a special master would be appointed to determine damages for individual plaintiffs based on calculations derived from Dr. Olsen's report.[107]

Defendants respond by arguing that Plaintiffs' briefings still "fail[ ] to identify how the central issue in this suit – i.e, specific causation – could be resolved on a classwide basis using classwide evidence."[108]  Additionally, Defendants argue that Plaintiffs' revised trial plan "suffers from even more problems than their original plan."[109]  Defendants then specifically set forth a number of alleged problems with Plaintiffs' revised trial plan.  First, Defendants argue that Plaintiffs' trial plan proposes to resolve liability by motion practice without a trial but fails to

---

[103]  Rec. Doc. 126 at p. 3.

[104]  *Id.* at pp. 3-4.

[105]  *Id.* at p. 4.

[106]  *Id.*

[107]  *Id.* at p. 6.

[108]  Rec. Doc. 129 at p. 1.

[109]  *Id.*

identify which elements of liability would be resolved by a motion for partial summary judgment.[110] Defendants contend that if Plaintiffs propose to resolve the issue of individual causation via a motion for partial summary judgment, they have again "failed to point to any classwide evidence that could be used to establish that Defendants actually caused harm to each class member – especially since the evidence reflects that a substantial portion of the absent class members experienced ***increased*** fuel volumes following the sulfur incident."[111]

Next, Defendants argue that Plaintiffs' proposal for class notice is problematic in that it proposes to provide notice to absent class members only after liability has been adjudicated in the first phase, in contravention of the rights of the absent class members.[112]  Defendants also note that Plaintiffs' proposed trial plan fails to provide significant details on how notice would be disseminated and who would bear the burden of providing class notice.[113]  Defendants then contend that Plaintiffs' proposed sample trials would violate Fifth Circuit precedent because the parties would select the sample plaintiffs[114] and because Plaintiffs have presented no evidence that the chosen plaintiffs would be representative of other dealers.[115]  Additionally, Defendants again argue that Dr. Olsen's model does not provide a reliable, formulaic method for calculating individual

---

[110]  *Id.* at p. 5.

[111]  *Id.* at p. 6 (citation omitted).

[112]  *Id.* (citations omitted).

[113]  *Id.* at pp. 6-7.

[114]  *Id.* at p. 7 (citing *In re Chevron*, 109 F.3d at 1019-20).

[115]  *Id.*

damages, such that it cannot be utilized for determining damages either during a sample trial or by a special master.[116]

Further, Defendants indicate that Plaintiffs' proposed trial plan is unclear on the role of the mediator.[117]  Defendants oppose Plaintiffs' trial plan on the grounds that it fails to take into account how to proceed if the parties are unable to reach a settlement agreement.[118]  Moreover, it is unclear whether plaintiffs envision that the parties would agree on a total damages figure or that the mediator would be empowered to impose one.  If it is the latter, Defendants contend that such a practice would violate their Seventh Amendment rights to have a jury serve as fact-finder.[119]  Similarly, Defendants contend that there exists no manageable basis for a special master to administer claims given the problems previously identified with Dr. Olsen's methodology.[120]  However, even ignoring the problems with Dr. Olsen's methodology, Defendants argue that it would be impermissible for a special master to calculate the damages for individual dealers because none of the components of the calculation would have been found by a jury, again depriving Defendants of their Seventh Amendment rights.[121]

---

[116]  *Id.* at p. 8.

[117]  *Id.*

[118]  *Id.*

[119]  *Id.*

[120]  *Id.* at p. 9.

[121]  *Id.* at pp. 9-10 ("More importantly, there would be no opportunity for a jury to find that the sulfur incident – as opposed to some other factor – was the actual cause of the sales decline at each particular station.  Rather, by rotely applying Dr. Olsen's methodology, the master would simply be ***assuming*** that 100% of each dealer's sales decrease was attributable to the sulfur incident.  Such a procedure would improperly deprive Defendants of their right to have a jury determine each and every element of Plaintiffs' cause of action.") (citing *Bell Atlantic*, 339 F.3d at 302).

During oral argument on the motion, Plaintiffs presented no new arguments in favor of certification.  Instead, Plaintiffs again stressed that damages are formulaic and can easily be calculated.  Specifically responding to the Court's question about the differing periods of closure necessitating individual calculations of damages for each plaintiff, Plaintiffs' counsel indicated that Dr. Olsen's formula could be modified to discount each plaintiff's damages by the plaintiff's individual period of shutdown.  Plaintiffs' counsel stressed that the Court should conditionally certify the class action, particularly in light of the "negative value" of the action to individual plaintiffs, and that the Court could always later reassess whether the action should be maintained as a class action.

Like Plaintiffs, at the hearing, Defendants presented little in the way of new arguments; instead, Defendants focused the Court's attention on the numerous shortcomings of Plaintiffs' proposed methodology for calculating damages, including Dr. Olsen's assumption of causation and failure to consider other variables that may have resulted in decreased sales volumes.  Defendants also highlighted Plaintiffs' failure to provide an adequate trial plan and noted that the present case differs from *Mullen* in that there are no overarching, global issues conducive to class determination here.[122]  Further, Defendants emphasized that proximate causation of damages is the controlling issue in this case and that Plaintiffs' burden to prove causation is not lessened merely because the case attempts to proceed as a class action.

---

[122]  Defendants noted that, in *Mullen*, there existed threshold questions such as the seaman status of the plaintiffs.

### C. Analysis

As previously noted, in order to certify a class under Rule 23(b)(3), a court must determine that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ."[123]   The Fifth Circuit has repeatedly explained that "[d]etermining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) requires district courts to consider 'how a trial on the merits would be conducted if a class were certified.'"[124] This Court reiterates that making this determination "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials."[125]   Here, the Court finds that proximate cause is the predominant issue that will control the outcome of this case as to liability and damages.  This is not a case like *Mullen* where there exist other overarching issues that predominate and will determine the case's outcome,[126] and Plaintiffs have failed to carry their burden to demonstrate that this issue of proximate cause effectively could be tried on a classwide basis and without resulting in countless individual mini-trials.

---

[123]  Fed. R. Civ. P. 23(b).

[124]  *Madison*, 637 F.3d at 555 (quoting *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003)).

[125]  *Id.* (internal quotations omitted).

[126]  In *Mullen*, the Fifth Circuit affirmed the district court's grant of class certification, finding no error in Judge Mary Ann Vial Lemmon's determination that "the issues to be tried commonly – seamen status, vessel status, negligence, and seaworthiness – were significant in relation to the individual issues of causation, damages, and contributory negligence" because the common issues, "especially negligence and seaworthiness," were "not only significant but also pivotal" and if the plaintiff "prevail[ed] on those two issues alone, they [would] prevail in the case."  186 F.3d at 626-27 (internal citations omitted).

In *Exxon*, the Fifth Circuit upheld a district court's denial of class certification when the district court "observed that each plaintiff's claims [would] be highly individualized with respect to proximate causation . . . ."[127]   There, Plaintiffs alleged that they were injured as a result of an oil leak and subsequent fire from Exxon Mobil's Baton Rouge Chemical Plant.[128]   The district court found the issue of proximate causation of injury individualized because issues such as susceptibility to illness and the types of physical injuries had to be determined for each plaintiff.[129]   Here, Plaintiffs' own expert has admitted that a variety of factors not included within his formula also may have led to the damages that he attributes solely to the contaminated fuel incident.   Accordingly, his model fails to adequately demonstrate a way to establish that any decreased sales volumes were proximately caused by the incident.   On this topic, the Court finds Defendants' hurricane example particularly persuasive as a specific example of another correlating factor that may have caused any resulting decreases in sales volume, whereas Dr. Olsen simply has assumed that *all* decreases resulted from the contamination incident.   Likewise, the Court finds it persuasive that other factors enumerated by Defendants, such as temporary road closures or construction near gas stations, may have also contributed to any observed sales decreases.   The Court is further persuaded of the tenuous nature of Dr. Olsen's assumption that all volume decreases resulted from the contamination incident because, according to Defendants' expert, even markets that did not potentially receive contaminated gasoline also experienced a sales decline during the relevant period.   Whether or not this information

---

[127]   461 F.3d at 602.

[128]   *Id.* at 600.

[129]   *Id.* at 602.

is true, Dr. Olsen's methodology fails to even consider that there may have been systemic sales volume decreases in the larger geographic area.

By Plaintiffs' expert's own admission, to assess the causes of volume decline would require assessing each gas station's individual circumstances "[d]ay by day and station by station."[130]  As such, there exists no classwide evidence as to proximate causation, nor a formulaic way to calculate damages.  Further, even if this Court were to ignore the potential causal variables ignored by Dr. Olsen, Dr. Olsen's methodology still would require a review of each station's individual business records.[131]  Thus, Dr. Olsen's methodology provides no way to determine causation other than merely assuming it, and his methodology fails to provide a formulaic way to calculate damages.  In such a situation, it would be impossible to determine causation or damages on a classwide basis.  Because determining causation and damages will require analyzing the specific circumstances for every class member on an individualized basis, this issue predominates over the issues common to the class members, and certification of a damages class is improper where the element of causation or "fact of damage" "cannot be established for every class member through proof common to the class."[132]

Furthermore, Plaintiffs' attempts at presenting a trial plan also fail to satisfy the predominance requirement.  Plaintiffs' initial motion for class certification contained no trial plan whatsoever.  Only after Defendants noted the absence of a trial plan did Plaintiffs subsequently

---

[130] *See* Rec. Doc. 101 (citing Ex. 14, Rec. Doc. 101-4 at p. 40 ¶ 11).

[131] Dr. Olsen's methodology would require the calculation of each gas station's historical profit margin, consideration of the length of closure for each station, and consideration of any offsets already offered by Defendants, among other factors.

[132] *Bell Atlantic*, 339 F.3d at 302.

attempt to provide one in their reply and supplemental briefing.  In various briefings, Defendants have pointed out the numerous problems with the trial plans submitted by Plaintiffs, and the Court finds Defendants' arguments persuasive.  Specifically, the Court agrees that Plaintiffs' trial plans adopt a "figure-it-out-as-we-go-along" approach, which the Fifth Circuit has specifically rejected.[133] At oral argument, Plaintiffs even conceded that their trial plan is not perfect and would be subject to revision in the future.  Plaintiffs' proposed trial plans simply do not provide a workable method for managing this case and largely ignores the specifics of how a trial might proceed if the parties were unable or unwilling to agree to a settlement.  Importantly, the Court also agrees with Defendants that Plaintiffs' trial plan raises Seventh Amendment concerns in that a second phase jury would be unable to determine damages without revisiting an earlier jury's determination of causation or in that a special master would calculate damages based upon facts not determined by a jury.

The Court notes that Plaintiffs have failed to identify any threshold questions to properly be answered at the outset on a classwide basis.  Plaintiffs have asserted that questions of liability predominate over the individual calculation of damages[134] and have identified questions such as whether class members received contaminated fuel, whether class members had to close their pumps, and whether class members received any compensation for their ancillary business losses.[135] However, although such questions may be common, they do not predominate over this action. Plaintiffs are correct that liability is a central, predominating question.  However, Plaintiffs have

---

[133] *Madison*, 637 F.3d at 557 (citing *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 426 (5th Cir. 2004)).

[134] *See, e.g.,* Rec. Doc. 116 at p. 4.

[135] Rec. Doc. 126 at p. 3.

failed to demonstrate how a key aspect of liability – proximate causation – is determinable on a classwide basis.

Although Plaintiffs have argued that causation is a threshold question, as noted above, the evidence before this Court demonstrates that the issue would require individualized proof and likely would require a series of individual trials, thus defeating the purposes of class certification. Accordingly, Plaintiffs have failed to meet their "demanding" burden to demonstrate that common legal issues predominate over individual issues. Instead, the issues that predominate, proximate causation as to liability and damages, are not capable of classwide determination, and Plaintiffs have failed to provide a workable trial plan. As such, class certification in this action would result in the case "degenerating into a series of individual trials,"[136] and defeat the very purposes of a class action. This case does not satisfy the strict predominance requirement necessary for class certification.

## III. Conclusion

For the foregoing reasons, Plaintiffs have failed to establish that the proposed class satisfies the predominance requirement of Federal Rule of Civil Procedure 23(b). Accordingly, even if this Court were to assume that Plaintiffs have met their burden as to the numerosity, commonality, typicality, adequacy of representation, and superiority requirements for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3), class certification is inappropriate here.

---

[136] *O'Sullivan*, 319 F.3d at 738.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Class Certification[137] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this  20th day of September, 2012.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[137] Rec. Doc. 96.

29